_____ FILED    _____ ENTERED
_____ LOGGED   _____ RECEIVED

MAR 1 2 2026

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY ʜᴄ                    DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO.** LKG-26-0004 |
| | * | |
| **JAMES E. LEE, JR.,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

\*\*\*\*\*\*\*

## FACTUAL BASIS FOR PLEA

The United States and the defendant, **JAMES E. LEE, JR.** ("**LEE**"), agree that the allegations in the one-count criminal information and the following facts are true and correct and that, at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence.

### I.   Background

1.     The United States Postal Service ("USPS") was an independent agency of the Executive Branch of the United States Government and headquartered in Washington, D.C.

2.     The defendant, **JAMES E. LEE, JR.** ("**LEE**"), was a resident of the State of Maryland. **LEE** was the owner of LEE CONSULTING GROUP, LLC ("LCG"), a strategic and environmental consultant for the packaging industry. LCG was incorporated in Delaware on or about April 9, 2020.

3.     OFFICIAL A was employed by the USPS from on or about July 15, 2000, until on or about May 28, 2024. OFFICIAL A served as an Expedited Packaging Specialist until on or

about July 30, 2022, when OFFICIAL A was promoted to Product Management Specialist. OFFICIAL A and **LEE** were associated.

4. COMPANIES A, B, and C were packaging solutions companies and corrugated box manufacturers headquartered in Pennsylvania, Michigan, and Georgia, respectively. COMPANY D was a label manufacturing company headquartered in Connecticut.

5. COMPANY A hired **LEE** in or about July 2018, shortly after he graduated from college. COMPANY A initially paid **LEE**'s salary. Beginning in or about mid-2019, a company affiliated with COMPANY A's Chief Executive Officer, EXECUTIVE A, paid **LEE**'s salary.

6. COMPANY B retained LEE and LCG for consulting services in or about July 2020. LEE's primary point of contact with COMPANY B was EXECUTIVE B.

7. COMPANY C retained LEE and LCG for consulting services in or about June 2020. LEE's primary points of contact with COMPANY C were EXECUTIVE C1 and EXECUTIVE C2.

8. COMPANY D retained LEE and LCG for consulting services in or about early to mid-2023. LEE's primary points of contact with COMPANY D were EXECUTIVE D1 and EXECUTIVE D2.

## II. USPS Expedited Packaging Supplies

9. The USPS provides expedited packaging supplies ("EPS") specially designed for use with its domestic and international priority mail express and priority mail services at no additional cost to customers. EPS includes corrugated containers, envelopes, and a range of pressure-sensitive labels and decals.

10.     The EPS program is managed by the USPS's Packaging Services team within the Shipping and Commerce Product Management Department.  EPS are produced by third-party manufacturers that are contracted by the USPS to produce the materials to the designs and specifications of the Packaging Services team.  The Packaging Services team also evaluates technical proposals and sample materials submitted by prospective suppliers and provides feedback to the USPS contracting officials for EPS contracts.

11.     As part of the USPS's procurement process, the assigned Contracting Officer often appoints a Contracting Officer's Representative ("COR") to handle the day-to-day administration of the contract.  The COR serves as the USPS's point of contact with the supplier on all routine matters.  A COR is responsible for the technical aspects of the project and for acting as the technical liaison with the supplier.  The COR is also responsible for final inspection and acceptance of all reports and ensuring the performance of the contract was accomplished according to the contract.  The COR has many other responsibilities, including contract management, payment responsibilities, budgeting, reporting on quality, safety and other performance aspects and various upward reporting responsibilities.

12.     OFFICIAL A's responsibilities included serving as the COR on several USPS contracts to provide EPS.  OFFICIAL A also served as the chairperson or lead on several technical evaluation teams used by the USPS during the solicitation and procurement process to evaluate the technical aspects of bid proposals from prospective suppliers.  The technical evaluation team chairperson is responsible for preparing the team's recommendation and submitting it to the Contracting Officer.

13. Beginning in or about mid-2018, and continuing until in or about November 2023, in the District of Maryland and elsewhere, the defendant, **JAMES E. LEE, JR.,** along with OFFICIAL A and others known and unknown, knowingly and willfully conspired together and with each other to engage in bribery and honest services wire fraud. The conspiracy was carried out through the following manner and means, among others:

14. **LEE,** OFFICIAL A, and others agreed to engage in corrupt schemes in which OFFICIAL A steered the procurement process for certain EPS contracts so they would be awarded to, or retained by, COMPANIES A-D. OFFICIAL A steered the procurement process by (a) providing preferential treatment and competitive advantages to COMPANIES A-D, including reviewing draft bid proposals and disclosing to them confidential USPS information regarding pricing and other issues; (b) using OFFICIAL A's position to perform official acts and advocate for, recommend, and influence other USPS officials to select COMPANIES A-D for EPS contracts and modifications; and (c) using **LEE** and LCG as an intermediary for OFFICIAL A and COMPANIES A-D to assist and conceal OFFICIAL A's efforts to steer the procurement process. OFFICIAL A was placed on retainer and agreed to perform, and did perform, official acts—and advised other officials, knowing and intending such advice to form the basis for official acts—on an as-needed basis for COMPANIES A-D as opportunities arose. OFFICIAL A's official acts, and OFFICIAL A's efforts to influence other officials, benefited COMPANIES A-D regarding the awarding, modifying, administering, and supervising of the USPS EPS contracts.

15. COMPANY A hired and paid **LEE** as a salaried employee and COMPANIES B-D retained and paid **LEE** and LCG for consulting services. In total, **LEE** received approximately $433,000 in salary from COMPANY A (and EXECUTIVE A's affiliated company), which

included bonuses on or about August 31, 2020 (approximately $25,000); on or about December 31, 2020 (approximately $15,000); and on or about July 15, 2022 (approximately $20,000). **LEE** and LCG also received approximately $51,103 from COMPANY B; approximately $58,556 from COMPANY C; and approximately $13,087.50 from COMPANY D for consulting services.

16. In furtherance of the conspiracy and to effect its objects, **LEE**, OFFICIAL A, and others committed numerous overt acts in the District of Maryland and elsewhere, including the following examples:

17. Between in or about mid-2018 and in or about late 2020, after OFFICIAL A helped **LEE** obtain a job with COMPANY A, **LEE**, EXECUTIVE A, and others discussed pricing for specific EPS products often before the USPS had even issued the contract solicitations.

18. Between in or about mid-2018 and in or about November 2023, **LEE** exchanged numerous emails with EXECUTIVE A in which they discussed efforts to conceal **LEE**'s association with COMPANY A and OFFICIAL A from, among others, the USPS and COMPANY A's competitors

19. Between in or about mid-2018 and in or about November 2023, EXECUTIVE A would periodically ask **LEE** about "sharpening the pencil" or "going behind the curtain," which **LEE** understood to mean he should obtain confidential or internal USPS pricing data or procurement information from OFFICIAL A and provide it to EXECUTIVE A. **LEE** complied.

20. Between on or about November 6, 2020, and on or about March 10, 2021, after EXECUTIVE B tasked **LEE** to work on a COMPANY B project related to a USPS contract, **LEE** generated hand-written time sheets with hours that **LEE** and OFFICIAL A reportedly spent on the project.

5

21.    Between in or about July 2021 and in or about March 2022, **LEE** exchanged emails with EXECUTIVE B relating to efforts by COMPANY B to extend two of its contracts with the USPS with a price increase.  At least two of **LEE**'s emails referenced his discussions with OFFICIAL A, who was serving as the COR for each of these contracts.

22.    On or about March 21, 2022, OFFICIAL A texted **LEE**, suggesting language to include in COMPANY B's bid proposal.  **LEE** responded, "Tell [EXECUTIVE B] if there's an extension we need a retainer."  Later that day, OFFICIAL A, using a personal cellular telephone, had a call with EXECUTIVE B that lasted approximately 30 minutes.

23.    On or about August 10, 2023, after EXECUTIVE B emailed **LEE** stating that COMPANY B's "best and final pricing" for the USPS contract solicitation was due in six days, **LEE** emailed EXECUTIVE B to coordinate a call for "the three of us[.]"

24.    On or about August 11, 2023, EXECUTIVE B texted **LEE**, stating in part, "Let me know if you hear anything about our pricing[.]"  Approximately one minute later, **LEE** texted OFFICIAL A, stating, "When do you want to talk with [EXECUTIVE B]?"  OFFICIAL A, using a personal cellular telephone, called **LEE** approximately one minute later.  The call lasted approximately seven minutes.  At or near the conclusion of the call between **LEE** and OFFICIAL A, **LEE** texted EXECUTIVE B, suggesting they talk on August 14, 2023.

25.    On or about October 31, 2023, **LEE** texted OFFICIAL A, stating in part "Any movement on [EXECUTIVE B's] business?"  OFFICIAL A responded, "Call on Friday about that[.]"  The USPS awarded the EPS contract (valued at approximately $680 million) to COMPANY B on or about December 20, 2023.

26.    On or about June 1, 2020, **LEE** created a new LCG customer account for COMPANY C shortly after OFFICIAL A, using a personal cellular telephone, had a call with EXECUTIVE C1 that lasted approximately seven minutes. **LEE** then emailed a LCG invoice for $4,000 to EXECUTIVE C1's personal email address. **LEE** continued to send monthly invoices to EXECUTIVE C1 and EXECUTIVE C2, totaling approximately $58,556.25, through in or about mid to late 2021.

27.    Between on or about September 10, 2020, and on or about September 28, 2020, **LEE** exchanged emails and text messages with EXECUTIVE C2, proposing recommendations and edits relating to COMPANY C's bid proposal. **LEE** also generated handwritten notes that included information relating to hours reportedly worked by LEE and OFFICIAL A on COMPANY C's bid proposal.

28.    On or about April 4, 2023, OFFICIAL A and **LEE** had multiple telephone calls shortly after OFFICIAL A received notice that: (a) the USPS was going to issue a solicitation for an EPS labels contract; and (b) OFFICIAL A was going to serve as the chairperson for the technical evaluation team.

29.    The following day, on or about April 5, 2023, **LEE** texted EXECUTIVE D1, stating in part: "[N]eed to inform you of a large label RFQ coming out which I will have LCG consulting work up for you." **LEE** texted another message to EXECUTIVE D1, stating, "If we can have a 5 minute discussion at some point today or tomorrow that would be helpful!" EXECUTIVE D1 responded, "Will do[.]"

30.    On or about July 20, 2023, after **LEE** received portions of a revised bid proposal for COMPANY D, **LEE** texted OFFICIAL A, stating he would "[b]e there in 15." A few hours

7

later, OFFICIAL A texted **LEE**, stating, "Review done" and "It will be with your chair." **LEE** responded, "Coming over now."

31.    On or about July 21, 2023, **LEE** emailed EXECUTIVE D1 and EXECUTIVE D2, attaching a revised draft of COMPANY D's bid proposal. **LEE** texted OFFICIAL A shortly thereafter, stating: "Got edits sent off by 8am this morning. Asked to have them back by COB today and face to face final review on Tuesday prior to submission."

32.    On or about July 23, 2023, at approximately 2:55 p.m., **LEE** and OFFICIAL A met in-person. At approximately 3:42 p.m., **LEE** emailed EXECUTIVE D1 and EXECUTIVE D2, attaching edits to COMPANY D's draft bid proposal. **LEE** also had several telephone calls with EXECUTIVE D1 and EXECUTIVE D2 the following day.

33.    On or about August 31, 2023, **LEE** texted OFFICIAL A, stating: "Me, [EXECUTIVE D1] and [EXECUTIVE D2] speak next week on solution for meltaway label for poly/paper envelopes." OFFICIAL A responded, "Don't mess that up that could be a game changer for LCG[.] We have to talk ahead of time in detail[.] That's also something to go to packaging exchange with[.]" After **LEE** responded, "Ok", OFFICIAL A stated, "You have to shine on this in great detail and bring sustainability value to [EXECUTIVE D1 that EXECUTIVE D1] will understand."

## III.    Conclusion

34.    This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or the United States, and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

35.    The actions of the defendant as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Date: 3/12/2026

Edward P. Sullivan
Acting Chief, Public Integrity Section
U.S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, James E. Lee, Jr., and the United States, I hereby stipulate that the above Factual Basis for Plea is true and accurate and that, had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

James E. Lee, Jr.
Defendant

I am James E. Lee, Jr.'s attorney. I have carefully reviewed the above Factual Basis for Plea with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Robert C. Bonsib, Esq.
Attorney for James E. Lee, Jr.